FILED
United States Court of Appeals
Tenth Circuit

January 17, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEVIN LEO DONAHUE,

     Plaintiff - Appellant,

v.

OFFICER SHAUN WIHONGI; SALT
LAKE CITY POLICE DEPARTMENT;
SALT LAKE CITY CORPORATION,

     Defendants - Appellees.

No. 19-4005

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:17-CV-00312-DAK)**
_____

Karra J. Porter (J.D. Lauritzen with her on the briefs), of Christensen & Jensen, P.C., Salt
Lake City, Utah, for Plaintiff – Appellant.

John E. Delaney (Mark E. Kittrell with him on the brief), of Salt Lake City Corporation,
Salt Lake City, Utah, for Defendants – Appellees.
_____

Before **LUCERO**, **HARTZ**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     Kevin Donahue was walking home one night when he saw a woman outside his

neighbor's house.  Dr. Donahue thought she was trespassing, and a heated conversation

ensued.[1]  They approached two police officers, Officer Shaun Wihongi and Officer Shawn Bennett, who were investigating an incident a few houses away.  The officers questioned them separately.  The woman told Officer Wihongi her name was "Amy LaRose," which later turned out to be untraceable.  She claimed Dr. Donahue was drunk and had insulted her.  Dr. Donahue refused to provide his name but admitted he had been drinking and said the woman had hit him.  The officers eventually arrested and handcuffed Dr. Donahue.

Dr. Donahue sued Officer Wihongi, the Salt Lake City Police Department ("SLCPD"), and Salt Lake City Corporation ("SLC") (collectively, "Defendants").  He alleged Officer Wihongi violated his Fourth Amendment rights by (1) arresting him without probable cause, (2) using excessive force during the arrest, and (3) detaining him for too long.  Officer Wihongi moved for summary judgment.  The district court granted the motion on all three claims and dismissed the case.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] We refer to the Appellant as "Dr. Donahue" because he told the officers in this case that he was a physician.  *See* Wihongi 2 at 8:53-56.

## I. BACKGROUND

### A. *Factual Background*

We present the facts in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. *See Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).[2]

At 10:45 p.m. on April 21, 2015, Dr. Donahue saw Ms. LaRose hiding near his neighbor's house. He questioned her and told her to leave. When Ms. LaRose refused, Dr. Donahue called her "a piece of shit." App. at 136. She responded by punching his left jaw. Dr. Donahue told Ms. LaRose he would call the police. She said she was hiding from police officers investigating an incident a few houses away.

### 1. Interviews of Dr. Donahue and Ms. LaRose

Dr. Donahue and Ms. LaRose approached SLCPD Officers Bennett and Wihongi at the nearby house. Dr. Donahue explained, "This woman just assaulted me[;] I'd like to press charges on her." *Id.* at 137. Officer Bennett then began interviewing Dr. Donahue. Bennett 1 at 25:50-30:30; Bennett 2 at 0:00-2:10. Dr. Donahue explained Ms. LaRose had hit him, but he asked to wait before deciding to file a report. *Id.*

While Officer Bennett spoke with Dr. Donahue, Officer Wihongi separately interviewed Ms. LaRose. Wihongi 1 at 26:05-29:45. She gave Officer Wihongi her name

---

[2] This section draws on materials from the joint appendix that were presented to the district court on the summary judgment motion. These include the police bodycam videos from Officer Wihongi ("Wihongi 1" and "Wihongi 2") and Officer Bennett ("Bennett 1" and "Bennett 2"). When we cite the videos, we list the time stamp from the pertinent recording.

and birthdate which he later discovered were untraceable in the police database.[3]  She

also recounted her version of events:  Dr. Donahue, a stranger "drunker than Cooter

Brown," had approached her and called her a "piece of shit."  *Id.* at 26:40-57.

2.  **Pre-Arrest Conversation**

After speaking with Ms. LaRose, Officer Wihongi joined Dr. Donahue and Officer

Bennett.  Wihongi 2 at 29:34-45.  He heard Officer Bennett ask for Dr. Donahue's name.

*Id.* at 2:11-30.  When Dr. Donahue refused, Officer Wihongi explained why a name is

necessary for police assistance and recounted Ms. LaRose's allegations.  *Id.* at 2:33-3:32.

Dr. Donahue appeared to confirm that he had insulted Ms. LaRose during their

altercation, *id.* at 3:14-15,[4] but denied starting the altercation, *id.* at 6:22-35.

Officer Bennett left to hear Ms. LaRose's version of events.  Officer Wihongi then

told Dr. Donahue why he needed to investigate:  "Two people are telling us a story that's

completely different in dynamics and we have to . . . [decide] what's gonna happen here."

*Id.* at 6:48-56.  When Officer Wihongi asked, "Have you been drinking this evening,

sir?"  Dr. Donahue responded, "Yes."  *Id.* at 7:00-03.[5]  Officer Wihongi suggested Dr.

---

[3] As Officer Bennett explained in his deposition, the officers were unable to
identify Ms. LaRose in the SLCPD database, which includes warrants and drivers
licenses.

[4] Dr. Donahue's complaint also states he "call[ed] Ms. LaRose 'a piece of shit.'"
App. at 25.

[5] Dr. Donahue's declaration states he had one glass of wine during a late dinner
prior to walking in his neighborhood, but he did not disclose this to the officers.

Donahue was intoxicated and disruptive in violation of Utah's public intoxication statute, but Dr. Donahue denied both assertions. *Id.* at 7:12-29.

Officer Bennett, having permitted Ms. LaRose to leave, rejoined them. He asked Dr. Donahue if he had been drinking, and Dr. Donahue again replied, "Yes." *Id.* at 7:45-48. Officer Wihongi again requested Dr. Donahue's name, but he again refused. *Id.* at 8:26-33.

### 3. **Handcuffing**

Officer Wihongi then pulled Dr. Donahue up by his arm, saying, "Stand up, sir . . . You're gonna be detained . . . I'm not asking you, I'm telling you." *Id.* at 8:33-41. The officers pulled Dr. Donahue's hands behind his back and handcuffed him. *Id.* at 8:38-9:20. Dr. Donahue protested, "Please don't hurt me," claimed the officers were "twisting [his] wrist," and asked, "Why am I being detained?" *Id.* at 8:55-9:20. Officer Wihongi explained they were detaining him for public intoxication and failure to provide his name. *Id.* at 9:18-42. Officer Wihongi again requested Dr. Donahue's name, and he again refused. *Id.* at 12:05-07.

When the officers briefly stepped away from Dr. Donahue, Officer Wihongi whispered his suspicion that Ms. LaRose was a runaway from the nearby incident. *Id.* at 17:00-15. He directed Officer Bennett to run "Amy LaRose" in the SLCPD database. *Id.* at 17:48-56. Officer Bennett did so, but found nothing. *Id.* at 23:31-57. Officer Wihongi then told Dr. Donahue he was "suspicious," *id.* at 24:21-27, of Ms. LaRose and would

"make it known to . . . the sergeant . . . that we probably [should] take your handcuffs off," *id.* at 24:33-38.[6]

Throughout the encounter, Dr. Donahue had asked for a sergeant. *See, e.g.*, *id.* at 4:56-59, 8:18-21, 8:29-31, 12:22-25. Sergeant Wallace arrived 19 minutes after Dr. Donahue was handcuffed. *Id.* at 27:39-43. The parties agree that Dr. Donahue was released three minutes later.

---

[6] *See* Wihongi 2 at 22:03-06 (stating he was "kind of suspicious"); *id.* at 24:23-36 (stating he was "extremely suspicious").

The following time line summarizes the significant events described above.[7]

| Time Line | Event | Bodycam Video Time Stamp |
|---|---|---|
| 0:00 | Interviews of Ms. LaRose and Dr. Donahue begin. | Bennett 1 at 25:50-30:30; Bennett 2 at 0:00-2:10 |
| 11:40 | Dr. Donahue first admits he has been drinking. | Wihongi 2 at 7:00-03 |
| 12:25 | Dr. Donahue again admits he has been drinking. | Wihongi 2 at 7:45-48 |
| 13:06 | Dr. Donahue refuses to provide his name. | Wihongi 2 at 8:26-33 |
| 13:13 | Dr. Donahue is told he is being detained. | Wihongi 2 at 8:33-41 |
| 13:18 | The officers handcuff Dr. Donahue. | Wihongi 2 at 8:38-9:20 |
| 28:11 | The officers discover Ms. LaRose's name is not in the SLCPD database. | Wihongi 2 at 23:31-57 |
| (approximately) 35:19 | Dr. Donahue is released. | Off-camera |

## B. *Procedural Background*

Dr. Donahue filed a pro se complaint seeking damages under 42 U.S.C. § 1983.[8]

He alleged the Defendants violated his Fourth Amendment rights by (1) arresting him

---

[7] The time line begins when the officers started interviewing Dr. Donahue and Ms. LaRose, with 4 minutes and 40 seconds remaining on each officer's first bodycam video. The bodycam video time stamp, "Bennett 1 at 25:50," is thus equivalent to "Time line at 0:00."

[8] Counsel started representing Dr. Donahue after the Defendants filed their answer and following the initial pretrial conference.

without probable cause, (2) using excessive force during the arrest, and (3) detaining him for an excessively long period. Officer Wihongi moved for summary judgment based on qualified immunity.

On the first claim, the district court concluded Officer Wihongi had reasonable suspicion that Dr. Donahue violated Utah's "public intoxication" statute. *Donahue v. Wihongi*, No. 17-312, 2018 WL 6699743, at *3-4 (D. Utah Dec. 20, 2018). Officer Wihongi was therefore authorized to request Dr. Donahue's name under Utah's "stop-and-question" statute. *Id.*[9] The court further reasoned that Dr. Donahue's refusal to provide his name gave Officer Wihongi probable cause that Dr. Donahue had violated Utah's "failure-to-identify" statute. *Id.* In turn, this authorized Officer Wihongi to arrest Dr. Donahue under Utah's "arrest-with-probable-cause" statute. *Id.*[10]

On the second claim, the court determined Officer Wihongi's use of force to arrest Dr. Donahue was objectively reasonable. *Id.* at *4.

On the third claim, it determined Officer Wihongi detained Dr. Donahue for a reasonable amount of time. *Id.* at *4-5.

Because the district court found no constitutional violation by Officer Wihongi, it granted summary judgment to him on all three claims and entered judgment dismissing

---

[9] Although the district court found Officer Wihongi had reasonable suspicion, it explained this was "reasonable suspicion, though mistaken, that [Dr.] Donahue was publicly intoxicated." *Donahue*, 2018 WL 6699743, at *3.

[10] We discuss these four statutes, as referred to with this shorthand nomenclature, in greater detail below.

the case. *See* Doc. 10683417 at 1; Dist. Ct. Doc. 58 at 1 ("[T]he Court rules as a matter of law that no constitutional violation occurred . . . ."). Dr. Donahue timely appealed. For the reasons discussed below, we affirm.[11]

## II. **DISCUSSION**

Dr. Donahue cannot show Officer Wihongi violated his constitutional rights. Without an underlying constitutional violation, Dr. Donahue's claims for municipal liability against SLCPD and SLC also cannot stand. We conclude the district court did not err in granting summary judgment to Officer Wihongi and entering judgment for all Defendants.

### A. *Legal Background and Standard of Review*

Under 42 U.S.C. § 1983, a state actor acting under color of state law who deprives an injured person of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." State actors sued in their individual capacities may raise the defense of qualified immunity, which "shields public officials from [§ 1983] damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker*, 745 F.3d at 411 (alterations and quotations omitted).

---

[11] We have appellate jurisdiction to review a final decision that "terminates all matters as to all parties and causes of action." *Utah v. Norton*, 396 F.3d 1281, 1286 (10th Cir. 2005) (quotations omitted). We directed a limited remand to the district court to clarify the finality of the district court's summary judgment order and judgment with respect to the SLCPD and SLC. The district court entered a clarifying supplemental order explaining that "all claims against each and every named Defendant were and are hereby dismissed with prejudice." Dist. Ct. Doc. 58 at 1.

9

When a defendant asserts a qualified immunity defense, "the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 460 (10th Cir. 2013). We "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quotations omitted).

"[W]e review the award of summary judgment based on qualified immunity *de novo*." *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019) (quotations omitted). The movant must "show[] that there is no genuine dispute as to any material fact." *Estate of Booker*, 745 F.3d at 411 (quoting Fed. R. Civ. P. 56(a)). In applying this standard, courts view the facts and draw inferences in the light most favorable to the non-movant. *Id.* But the non-movant must "establish facts such that a reasonable jury could find in his favor," and "[u]nsubstantiated allegations will not suffice." *Lindsey*, 918 F.3d at 1113.

The Fourth Amendment "question [of] whether a police officer's observations amounted to reasonable suspicion or probable cause" and "the excessive force question" are "mixed question[s] of law and fact." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1253 (10th Cir. 2013) (quotations omitted). And "where there are no disputed questions of historical fact . . . such as on summary judgment," the court "make[s] the . . . determination [of reasonable suspicion, probable cause, or excessive force] on its own" as a question of law. *Id.; see Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (stating that at summary judgment, once the facts and inferences are drawn in the nonmovant's favor,

10

the determination of excessive force is a "pure question of law"); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (stating that once the facts are "admitted or established," the determination of reasonable suspicion or probable cause is a question of law); *United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005) (same).

B. *Analysis of Dr. Donahue's Three Claims*

1. **Claim 1 – Arrest Without Probable Cause**

Dr. Donahue argues the district court erred in finding Officer Wihongi had probable cause to arrest him.[12] We resolve this claim in two steps.

First, we consider whether the facts, viewed by an objectively reasonable police officer, *see Ornelas*, 517 U.S. at 696, gave Officer Wihongi reasonable suspicion that Dr. Donahue violated Utah's public intoxication statute, Utah Code Ann. § 76-9-701(1). If so, Officer Wihongi had authority to demand Dr. Donahue's name under the stop-and-question statute, *id.* § 77-7-15.

---

[12] Handcuffing during a detention is not necessarily an arrest. *See Muehler v. Mena*, 544 U.S. 93, 99-100 (2005) (holding use of handcuffs during search of a premises was reasonable under the Fourth Amendment); *United States v. Salas-Garcia*, 698 F.3d 1242, 1249 (10th Cir. 2012) (using handcuffs during an investigative detention does not necessarily turn a stop into an arrest). If Dr. Donahue was only detained and not arrested, the officers would have needed only reasonable suspicion. *See Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (explaining an investigative detention, unlike an arrest, need only be supported by reasonable suspicion, not probable cause). But Dr. Donahue claims he was arrested without probable cause when he was handcuffed. *See* Aplt. Br. at 12-14; *id.* at 22-36. "The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Cortez*, 478 F.3d at 1115-16 (brackets and quotations omitted). We analyze Claim 1 on the basis that, when the officers handcuffed him, Dr. Donahue was under arrest and probable cause was required.

11

Second, we consider whether the facts, viewed by an objectively reasonable police officer, *see Ornelas*, 517 U.S. at 696, gave Officer Wihongi probable cause that Dr. Donahue violated Utah's failure-to-identify statute, Utah Code Ann. § 76-8-301.5. If so, Officer Wihongi had authority to arrest him under the arrest-with-probable-cause statute, *id.* § 77-7-2(4).

We conclude Officer Wihongi had reasonable suspicion that Dr. Donahue was publicly intoxicated and therefore had the authority to demand his name. We also conclude Dr. Donahue's refusal to identify himself gave the officers probable cause to arrest him. The district court therefore did not err in finding no Fourth Amendment violation.

a. *Additional legal background*

Dr. Donahue's claim requires us to apply the federal Fourth Amendment[13] reasonable suspicion and probable cause standards to Officer Wihongi's detention and arrest of Dr. Donahue for state law offenses.[14] Below, we discuss (i) the Fourth Amendment's reasonable suspicion standard for an investigative stop, (ii) the Fourth Amendment's probable cause standard for a warrantless arrest, (iii) the circumstances in

---

[13] The Fourth Amendment's constitutional guarantees are "enforceable against the States through the Fourteenth [Amendment]." *Colorado v. Bannister*, 449 U.S. 1, 2 (1980) (per curiam).

[14] *See* Ivan E. Bodensteiner and Rosalie Berger Levinson, 1 State and Local Gov't Civ. Rights Liab. § 1:11 (Nov. 2019 update) (explaining a court can "determin[e] whether an officer had probable cause to make an arrest for a violation of state law" by "applying the Fourth Amendment standard" to the "identif[ied] . . . elements of a crime, based on state law").

12

which an informant's tip might give rise to reasonable suspicion or probable cause, (iv) the Utah state statutes at issue in this case, and (v) cases addressing Utah's public intoxication statute.

i. Reasonable suspicion

The Fourth Amendment permits a police officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see INS v. Delgado*, 466 U.S. 210, 217 (1984) (explaining that reasonable suspicion requires "some minimal level of objective justification"). Reasonable suspicion must be more than an "inchoate and unparticularized suspicion or hunch." *Alabama v. White*, 496 U.S. 325, 329 (1990) (quotations omitted). But it "is a less demanding standard than probable cause" and can be established with information "differ[ing] in quantity or content" or that is "less reliable." *Id.* at 330.[15]

To assess whether an officer had "particularized and objective" reasonable suspicion, courts consider the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). The determination "must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*,

---

[15] This court has said that reasonable suspicion "requires considerably less than a preponderance of the evidence and obviously less than that required for probable cause to effect an arrest." *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (quotations omitted). It "can be shown by evidence that is inherently less reliable in kind than the sort of evidence needed to establish probable cause." *Id.*

13

528 U.S. 119, 125 (2000). "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. "[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *Mocek v. City of Albuquerque*, 813 F.3d 912, 923 (10th Cir. 2015) (quotations omitted).

### ii. Probable cause

Under the Fourth Amendment, a warrantless arrest requires probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *A.M. v. Holmes*, 830 F.3d 1123, 1140 (10th Cir. 2016) (identifying the "basic federal constitutional right of freedom from arrest without probable cause" (quotations omitted)).

Police officers have probable cause to arrest if "the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Adams v. Williams*, 407 U.S. 143, 148 (1972) (alterations and quotations omitted). As with reasonable suspicion, courts assess probable cause "from the standpoint of an objectively reasonable police officer" under the totality of the circumstances. *Ornelas*, 517 U.S. at 696.

### iii. Informants

Both reasonable suspicion and probable cause may arise from information provided by individuals.[16] An anonymous tip alone without "indicia of reliability" is not enough. *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

Relevant considerations include whether the officers corroborated details of the tip, such as the informant's "basis of knowledge" and "veracity." *Id.* at 241.[17] "[E]yewitness knowledge . . . [also] lends significant support to the tip's reliability." *Navarette v. California*, 572 U.S. 393, 399 (2014). Officers "may weigh the credibility of witnesses." *Mocek*, 813 F.3d at 928 (quotations omitted). Face-to-face informants generally are more reliable than anonymous informants because they "allow[] the police an opportunity to evaluate [their] credibility and demeanor." *See United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) ("A face-to-face informant must, as a general matter, be thought more reliable than an anonymous . . . tipster." (brackets and quotations omitted)). Courts may also apply less "skepticism and careful scrutiny" to the

---

[16] *See Illinois v. Gates*, 462 U.S. 213, 233 (1983) (explaining reasonable suspicion can arise where an anonymous tip has sufficient indicia of reliability); *Adams*, 407 U.S. at 147 ("[W]e reject [the] argument that reasonable [suspicion] for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person."); *Jaben v. United States*, 381 U.S. 214, 224 (1965) (citizen-witness's tip relevant to probable cause inquiry).

[17] Whether reasonable suspicion exists is a highly fact-specific inquiry, and "[o]ne simple rule will not cover every situation." *Adams*, 407 U.S. at 147; *compare White*, 496 U.S. at 330-31 (reasonable suspicion existed when police "sufficiently corroborated" anonymous tip's prediction of suspect's movements and car location); *with J.L.*, 529 U.S. at 270-71 (no reasonable suspicion where anonymous informant's tip accurately described suspect but officers could not corroborate tip's assertion of illegality).

reliability of "an identified victim or ordinary citizen witness" than the often-anonymous informant who "supplies information on a regular basis." *Easton v. City of Boulder*, 776 F.2d 1441, 1449-50 (10th Cir. 1985) (quotations omitted).

        iv. Utah statutes

This case concerns four Utah statutes:

(1) The public intoxication statute, Utah Code Ann. § 76-9-701(1), which prohibits a person from being "under the influence of alcohol . . . to a degree that the person may endanger the person or another, in a public place."

(2) The stop-and-question statute, *id.* § 77-7-15, which allows a police officer to "stop any individual" and "demand the individual's name" if "the officer has a reasonable suspicion . . . the individual has committed or is in the act of committing or is attempting to commit a public offense."

(3) The failure-to-identify statute, *id.* § 76-8-301.5(1), which states:

> A person is guilty of failure to disclose identity if during the period of time that the person is lawfully subjected to a stop as described in [the stop-and-question statute]:
>
> > (a) a peace officer demands that the person disclose the person's name or date of birth;
> >
> > (b) the demand described in Subsection (1)(a) is reasonably related to the circumstances justifying the stop;
> >
> > (c) the disclosure of the person's name . . . does not present a reasonable danger of self-incrimination in the commission of a crime; and
> >
> > (d) the person fails to disclose the person's name . . . .

(4) The arrest-with-probable-cause statute, *id.* § 77-7-2(4), which allows a police officer to arrest without a warrant "when the peace officer has reasonable

16

cause to believe the person has committed the offense of failure to disclose identity under [the failure-to-identify statute]."[18]

### v. Case law on public intoxication

As already explained, Claim 1 requires us to determine whether Officer Wihongi had reasonable suspicion that Dr. Donahue violated the public intoxication statute. Utah's public intoxication statute has three elements:  (1) "under the influence of alcohol," (2) "to a degree that the person may endanger the person or another," and (3) "in a public place."  Utah Code Ann. § 76-9-701(1).  Dr. Donahue "admits that he was in public for purposes of Utah's public intoxication statute."  Aplt. Br. at 32.  But we must still determine whether he satisfied the statute's "under the influence" and "may endanger" elements.  The following case law informs our analysis.

### 1)  Under the influence

The first element requires that a person be "under the influence of alcohol."  Utah Code Ann. § 76-9-701(1).  "[A] citizen-informant's tip" can provide the police with reasonable suspicion a person is "under the influence" because "members of the general public have . . . common knowledge about whether a person is under the influence of alcohol."  *State v. Lloyd*, 263 P.3d 557, 564 (Utah Ct. App. 2011) (alterations and

---

[18] Although § 77-7-2(4) requires "reasonable cause," not "probable cause," the Supreme Court has explained that statutes requiring "reasonable grounds" are equivalent to the Fourth Amendment's requirement of "probable cause."  *See Wong Sun v. United States*, 371 U.S. 471, 478 n.6 (1963) ("The terms 'probable cause' for purposes of the Fourth Amendment and 'reasonable grounds' as used in the statute, mean substantially the same."); 3 Wayne R. LaFave, Search and Seizure § 5.1(b)  n.73 (5th ed. 2012) ("Other verbal formulae used in statutes defining arrest powers are typically taken as intended to express the Fourth Amendment probable cause test.").

17

quotations omitted).[19]  For example, this circuit has held that an officer had reasonable

suspicion that a suspect violated Utah's public intoxication statute when officers received

an anonymous report of an unconscious man in a field and corroborated the report's key

information by "personally observ[ing]" the man's presence in the field.  *United States v.*

*Garner*, 416 F.3d 1208, 1215 (10th Cir. 2005).[20]  We also have found a suspect's

admission that he "had one beer three hours ago" gave an officer reasonable suspicion

that a suspect was driving "under the influence."  *Vondrak v. City of Las Cruces*, 535

F.3d 1198, 1207 (10th Cir. 2008) (quotations omitted).[21]

2)  May endanger

---

[19] We have identified only one Utah Supreme Court case interpreting the "under the influence" element of Utah's public intoxication statute at length.  *See State v. Trane*, 57 P.3d 1052, 1062 (Utah 2002) (determining officers had probable cause that a suspect violated the public intoxication statute when the suspect "exhibited signs of intoxication" by "smell[ing] of alcohol," "swaying," and "slurr[ing]" his speech.").

[20] *Garner* is a Tenth Circuit case, and Utah courts are the "ultimate authority" on Utah law.  *Holmes*, 830 F.3d at 1140 (quotations omitted).  But like this case, *Garner* involved a federal constitutional right, and reasonable suspicion is a federal constitutional standard.  *See, e.g.*, *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173, 1173 n.3 (9th Cir. 2005) (explaining where suspect "was the subject of an investigatory traffic stop, the reasonableness of [the stop] depends only on reasonable suspicion, not on compliance with state . . . law," because "the reasonableness of a seizure depends exclusively on federal law").  *Garner* is thus relevant to our analysis.

[21] The *Vondrak* court found the officer properly conducted a field sobriety test because the officer had reasonable suspicion the driver was "under the influence." *Vondrak*, 535 F.3d at 1206-07.  We note the *Vondrak* court's analysis arose under a slightly more stringent statutory standard, as its analysis was "buttressed by New Mexico law," which proscribes driving while under the influence "to the slightest degree."  *Id.* at 1207 (citing N. M. Stat. Ann. § 66–8–102(A) (2008)).  By contrast, the Utah public intoxication statute proscribes being "under the influence" to a degree that the person *may endanger* the person or another."  Utah Code Ann. § 76-9-701(1) (emphasis added).

18

The public intoxication statute uses the phrase "may endanger the person or another." Utah Code. Ann. § 76-9-701(1). In *Due South*, *Inc. v. Department of Alcoholic Beverage Control*, 197 P.3d 82 (Utah 2008), the Utah Supreme Court said this element requires "a reasonable likelihood of harm based on the circumstances," not "a speculative possibility." *Id.* at 90. The court pointed to *State v. Trane*, 57 P.3d 1052 (Utah 2002), where the suspect's "aggressive behavior" of "'puff[ing] his chest out'" and "'[taking] a defensive posture'" made the officers fear for their safety, as an example of probable cause of endangerment. *Due South, Inc.*, 197 P.3d at 91 (quoting *Trane*, 57 P.3d at 1062). The *Due South* court also looked to the Texas public intoxication statute, which employs the same "may endanger" element as Utah's statute and requires "proof of potential danger." *Id.* at 90.[22]

b. *Analysis*

We agree with the district court that Officer Wihongi had reasonable suspicion that Dr. Donahue violated Utah's public intoxication statute. Officer Wihongi therefore had authority to demand Dr. Donahue's name under Utah's stop-and-question statute. We also agree that Officer Wihongi had probable cause that Dr. Donahue violated Utah's

---

[22] For example, Texas courts have found that an individual "buying tire chains" from a service station "and indicating an intent to drive" showed probable cause of endangerment. *Due South, Inc.*, 197 P.3d at 90 (citing *Bentley v. State*, 535 S.W.2d 651, 653 (Tex. Crim. App. 1976)). Texas courts have also held that an individual "sleeping in a car . . . [and] presenting the likelihood that the individual would wake up and drive home" satisfied the endangerment requirement. *Id.* (citing *Dickey v. State*, 552 S.W.2d 467, 468 (Tex. Crim. App. 1977)). They have also specified that the potential danger "need not be [an] immediate" or "specific, identifiable danger." *Padilla v. State*, 697 S.W.2d 522, 524 (Tex. Ct. App. 1985).

failure-to-identify statute, which gave Officer Wihongi authority to arrest under the arrest-with-probable-cause statute. The arrest thus did not violate Dr. Donahue's Fourth Amendment rights. The district court properly granted summary judgment for Officer Wihongi.

i. Reasonable suspicion of intoxication to justify stop-and-question

We begin by determining whether Officer Wihongi had reasonable suspicion under the "totality of the circumstances" that Dr. Donahue violated Utah's public intoxication statute. *Arvizu*, 534 U.S. at 273 (quotations omitted). We draw all facts and inferences in Dr. Donahue's favor and determine whether reasonable suspicion existed as a question of law. *See Cavanaugh*, 718 F.3d at 1253. Our analysis considers whether Officer Wihongi had reasonable suspicion that Dr. Donahue satisfied the "under the influence" and "may endanger" elements. We address these interrelated elements in turn, acknowledging that the statute ties the extent of intoxication to the risk of endangerment. *See* Utah Code Ann. § 76-9-701(1) ("[U]nder the influence . . . to a degree that the person may endanger the person or another.").

1) Under the influence

Considering the totality of the circumstances, we conclude Officer Wihongi had reasonable suspicion that Dr. Donahue was "under the influence." This suspicion arose from two sources. First, Ms. LaRose told Officer Wihongi that Dr. Donahue appeared "drunker than Cooter Brown." App. at 122; *id.* at 53. She had observed Mr. Donahue's behavior and could judge whether he was intoxicated. *See Navarette*, 572 U.S. at 399 (eyewitness knowledge supported the tip's reliability); *Lloyd*, 263 P.3d at 564 (holding

20

that ordinary citizens can assess whether a person is under the influence of alcohol).

Even discounting for her apparent hostility to Dr. Donahue, the officers could reasonably conclude that Ms. LaRose, who spoke face-to-face with the police, had more incentive to tell the truth about his drunkenness than an anonymous informant. *See Sanchez*, 519 F.3d at 1214 (police's ability to evaluate face-to-face informant's credibility and demeanor supported tip's reliability). Her information provided an even stronger basis for reasonable suspicion than the anonymous tip in *Garner*, 416 F.3d at 1215, which determined that an anonymous informant's tip and the officer's corroboration constituted reasonable suspicion. Further, we are generally less skeptical of the reliability of victim-witnesses who are not anonymous, professional informants. *See Easton*, 776 F.2d at 1449-50.

Second, Officer Wihongi heard Dr. Donahue corroborate Ms. LaRose's story. While speaking with the officers, Dr. Donahue acknowledged he had an altercation with Ms. LaRose. Wihongi 2 at 2:33-3:32. He also twice admitted that he had been drinking. Wihongi 2 at 7:00-03, 7:45-48. These admissions support Officer Wihongi's reasonable suspicion that Dr. Donahue was "under the influence." *See Vondrak*, 535 F.3d at 1207 (officer had reasonable suspicion that suspect was "under the influence" where suspect admitted to having "had one beer three hours ago").

Dr. Donahue argues Officer Wihongi lacked reasonable suspicion because he did not appear intoxicated, was "articulate," and "wasn't slurring his words." App. at 82 (Officer Wihongi's deposition testimony describing Dr. Donahue's behavior). But "reasonable suspicion may exist even if it is more likely than not that the individual is not

21

involved in any illegality," *Mocek*, 813 F.3d at 923 (quotations omitted), and it "need not rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277. Further, even if Dr. Donahue did not exhibit outward signs of intoxication, Officer Wihongi had two "particularized and objective" reasons—Ms. LaRose's statements and Dr. Donahue's own admissions—to suspect he was intoxicated. *Arvizu*, 534 U.S. at 273 (quotations omitted). Officer Wihongi had "some minimal level of objective justification" to believe Dr. Donahue was under the influence in violation of Utah's public intoxication statute. *Delgado*, 466 U.S. at 217. This reasonable suspicion was based on more than an "unparticularized suspicion," even if less than what is required for a showing of probable cause. *White*, 496 U.S. at 329.

### 2) May endanger

Officer Wihongi also had reasonable suspicion to believe Dr. Donahue satisfied the "may endanger" element of the public intoxication statute. When the officers first encountered Dr. Donahue and Ms. LaRose, it was nearly 11 o'clock at night, and the officers were investigating a separate incident. Ms. LaRose and Dr. Donahue agreed that Dr. Donahue had been drinking and had shouted an epithet at her. Each claimed the other had started the altercation. Wihongi 1 at 26:40-44; Wihongi 2 at 6:22-35. Dr. Donahue also alleged that Ms. LaRose had punched him.

The officers weighed the credibility of the two accounts as they endeavored to sort out what had happened. *See Mocek*, 813 F.3d at 928 (explaining officers may weigh the credibility of witnesses). Although Dr. Donahue did not demonstrate overtly aggressive behavior in front of the officers, *see Trane*, 57 P.3d at 1062, they observed he was

22

"agitated, irritated," and "argumentative." App. at 226. By contrast, the videos show that Ms. LaRose cooperated with the officers' questioning. *See, e.g.*, Wihongi 1 at 26:05-29:45. Under the totality of the circumstances, the officers reasonably assessed the two accounts. In deposition testimony, Officer Wihongi explained that Ms. LaRose was "confronted by somebody who she described as drunk" and perceived that Dr. Donahue had "threatened her." App. at 81. Officer Bennett similarly questioned why Dr. Donahue was "scaring" and "questioning [people] when they're just walking." Wihongi 2 at 7:54-57.

Reasonable suspicion requires only "some minimal level of objective justification," *Delgado*, 466 U.S. at 217, "based on commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125. Further, the public intoxication statute prohibits being under the influence only "to a degree that the person *may* endanger the person or another." *See* Utah Code. Ann. § 76-9-701(1) (emphasis added). We conclude the officers had reasonable suspicion that Dr. Donahue posed a non-"speculative" risk of endangerment. *Due South, Inc.*, 197 P.3d at 90.

*    *    *    *

Officer Wihongi had reasonable suspicion to believe Dr. Donahue was "under the influence" and posed a risk of endangerment in violation of the public intoxication statute. *See* Utah Code Ann. § 76-9-701(1). Officer Wihongi was therefore authorized to "demand" Dr. Donahue's name under the stop-and-question statute. *Id.* § 77-7-15.

23

ii. Probable cause to arrest for failure-to-identify

Having determined that Officer Wihongi had authority to demand Dr. Donahue's name, we proceed to the second step of our analysis. This step requires us to determine whether Officer Wihongi had probable cause to arrest Dr. Donahue for "fail[ing] to disclose [Dr. Donahue's] name" while "lawfully subjected to a stop," as required under the failure-to-identify statute. *Id.* § 76-8-301.5(1). We conclude that he did.

When Officer Wihongi demanded Dr. Donahue's name and Dr. Donahue refused, Wihongi 2 at 8:26-33, Officer Wihongi had probable cause that Dr. Donahue violated the failure-to-identify statute, Utah Code Ann. § 76-8-301.5.[23] This authorized Officer Wihongi to arrest him without a warrant under the arrest-with-probable-cause statute, *id.* § 77-7-2(4). We therefore agree with Officer Wihongi that "[w]hen [Dr.] Donahue refused [to provide his name], he broke the law in [Officer] Wihongi's presence, thus giving immediate rise to probable cause." Aplee. Br. at 21.

---

[23] This satisfies elements (1) and (4) of the failure-to-identify statute: (1) Officer Wihongi demanded Dr. Donahue's name and (4) Dr. Donahue failed to provide his name. *See* Utah Code Ann. § 76-8-301.5(1)(a), (d). The parties do not contest elements (2) and (3) of Utah's failure-to-identify statute: (2) the demand was "reasonably related" and (3) Dr. Donahue's disclosure would not have presented a "reasonable danger of self-incrimination." *See id.* § 76-8-301.5(1)(b), (c).

24

c. *Dr. Donahue's "stop" argument*

Dr. Donahue argues he was not "lawfully subjected to a stop" under Utah's stop-and-question statute. *See* Aplt. Br. at 36-37; Aplt. Reply Br. at 11-13.[24] We disagree. Although Dr. Donahue initially approached the officers, they eventually detained him "for purposes of investigating possibly criminal behavior." *Terry*, 392 U.S. at 22. "[T]aking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quotations omitted); *see also United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017) (explaining an officer may seize someone without using physical force when the officer shows his authority and the citizen submits).[25] "Even an initially consensual encounter can be transformed into a seizure or detention within the meaning of the Fourth Amendment." *Kaupp*, 538 U.S. at 632 (alterations and quotations omitted). As we explain below, the detention here occurred no later than Dr. Donahue's second admission of drinking.

---

[24] In *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000), we said the stop-and-question statute, Utah Code Ann. § 77-715, "codifies the requirements for investigative detention."

[25] *Compare United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996) (determining officer's "routine questions," which were not made in a "commanding or threatening manner or tone of voice," did not render the consensual encounter a seizure), *with United States v. Little*, 60 F.3d 708, 712-13 (10th Cir. 1994) (determining drug enforcement agent's "[a]ccusatory, persistent, and intrusive questioning" of suspect in confined location was a seizure (quotations omitted)).

After Dr. Donahue and Ms. LaRose approached the police, the officers interviewed them separately about their altercation.[26] At about 7 minutes into the interviews, the officers ordered Dr. Donahue to provide his name. Wihongi 2 at 2:11-30. Dr. Donahue refused. *Id.* He was seated on a retaining wall while each officer stood above and questioned him from either side. Officer Wihongi continued questioning Dr. Donahue while Officer Bennett walked about one house away, questioned Ms. LaRose, and permitted her to leave. After his first denial of drinking, *id.* at 7:00-03, the officers told him he was intoxicated and disruptive, which he denied, *id.* at 7:12-29. After Dr. Donahue's second denial of drinking, *id.* at 8:26-33, the officers had reasonable suspicion that he had violated the public intoxication statute.

At this point, under "all of the circumstances," a reasonable person in Dr. Donahue's position would not have felt free to leave. *See Kaupp*, 538 U.S. at 629; *California v. Hodari D.*, 499 U.S. 621, 638 (1991). The officers' questioning may not have been especially accusatory and intrusive. *See United States v. Little*, 60 F.3d 708, 712-13 (10th Cir. 1994). But as evidenced in the video, they used a "commanding manner or tone." *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996). While the officers permitted Ms. LaRose to leave, they continued questioning Dr.

---

[26] *See Reyes v. Ctr. N. M. Cmty. Coll.*, 410 F. App'x 134, 135 (10th Cir. 2011) (unpublished) (holding detention reasonable to investigate an "argument" that "became contentious and nearly escalated to a physical altercation"). Although not precedential, we find the reasoning of this unpublished opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

Donahue.[27]  They repeatedly conveyed their need for Dr. Donahue's name for their investigation of the altercation.  Wihongi 2 at 6:48-56; *see Bostick*, 501 U.S. at 437; *see also Morgan v. Woessner*, 997 F.2d 1244, 1253 (9th Cir. 1993) ("When a citizen expresses his or her desire not to cooperate, continued questioning cannot be deemed consensual." (emphasis omitted)).[28]  The officers developed and expressed concerns about Dr. Donahue's drinking, his ambivalence about reporting the altercation, his refusal to identify himself, and his overall agitation and lack of cooperation.

Although Dr. Donahue had initially approached the officers, and the officers did not apply physical force, the interaction became a "stop."  A reasonable person would have recognized and submitted to their show of authority.  *See Roberson*, 864 F.3d at 1121 (citing *Hodari D.*, 499 U.S. at 626).  The detention occurred before he refused to give his name a second time, Wihongi 2 at 8:26-33, at which point the officers had probable cause for a failure-to-identify violation.

*   *   *   *

---

[27] The videos show that Dr. Donahue and Ms. LaRose were about one house apart on the same block and that it took Officer Bennett approximately 10 seconds to walk from Dr. Donahue to Ms. LaRose.  *See* Bennett 2 at 4:07-21.  This suggests that Dr. Donahue observed that Ms. LaRose was free to leave, while he was not.

[28] The resolution of particularized and objective yet still ambiguous—potentially lawful, potentially unlawful—facts is the central purpose of an investigative detention.  *See Illinois v. Wardlow,* 528 U.S. 119, 125 (2000) ("Even in *Terry,* the conduct justifying the stop was ambiguous and susceptible of an innocent explanation . . . .  *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.").

Officer Wihongi had reasonable suspicion that Dr. Donahue violated the public intoxication statute. This authorized the police to demand Dr. Donahue's name under the stop-and-question statute. When Dr. Donahue refused, the police had probable cause to arrest him under the failure-to-identify statute. The district court therefore correctly determined that Officer Wihongi did not violate Dr. Donahue's Fourth Amendment rights in arresting him.

## 2. Claim 2 – Excessive Force

Dr. Donahue asserts that Officer Wihongi used excessive force while arresting him, thereby violating his Fourth Amendment rights. Below, we provide legal background on Fourth Amendment excessive force claims. We conclude Officer Wihongi did not use excessive force and the district court therefore did not err in finding no Fourth Amendment violation.

### a. *Additional legal background*

When a plaintiff alleges an officer used excessive force to arrest, "the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Courts consider excessive force claims under the balancing test from *Graham v. Connor*, 490 U.S. 386 (1989), which delineates "three, non-exclusive factors": "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Under the first factor, a "minor offense . . . support[s] the use of minimal force." *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016). A misdemeanor committed in a "particularly harmless manner . . . reduces the level of force . . . reasonable for [the officer] to use." *Casey v. City of Fed. Heights*, 509 F.3d at 1281; *see Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (petty misdemeanor required reduced force).

Under the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others. *Compare Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) (suspect who repeatedly refused to drop gun and had previously threatened his wife was immediate threat); *with Casey*, 509 F.3d at 1282 ("slightly upset but not disrespectful" suspect was not immediate threat (quotations omitted)).

As to the third factor, courts do not consider a suspect who asks questions, or asks to be treated carefully, as actively resisting. *See Cortez*, 478 F.3d at 1128 (no active resistance where plaintiff briefly "asked [d]efendants what was going on"); *Fisher*, 584 F.3d at 896 (no active resistance where suspect "begged the officers to take account of his injuries").

The *Graham* test asks if the officers' actions were "objectively reasonable," *Cortez*, 478 F.3d at 1125 (quotations omitted), and recognizes that officers need to make "split-second judgments," *id.* at 1138 (quotations omitted). "[A] small amount of force, like grabbing [a suspect] and placing him in the patrol car, is permissible in effectuating an arrest under the Fourth Amendment." *Id.* at 1128.

29

An excessive force claim that includes a challenge to the "[m]anner or course of handcuffing" requires the plaintiff to show both that "the force used was more than reasonably necessary" and "some non-de minimis actual injury." *Fisher*, 584 F.3d at 897-98 (quotations omitted).[29] *Compare Vondrak*, 535 F.3d at 1209 ("actual injury" showing where plaintiff's doctors identified permanent nerve injury directly attributable to the tight handcuffing), *with Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (no "actual injury" showing from photographs and hospital records describing plaintiff's injuries as "superficial abrasions"), *and Cortez*, 478 F.3d at 1129 (no "actual injury" showing where only record evidence was plaintiff's "affidavit that the handcuffs left red marks that were visible for days afterward").

b. *Analysis*

When Officer Wihongi and Officer Bennett arrested Dr. Donahue, Officer Wihongi pulled Dr. Donahue up, and both officers pulled Dr. Donahue's arms back and handcuffed him. *See* Wihongi 2 at 8:33-9:42. Under *Graham*, these actions were "objectively reasonable" and not excessive. *Cortez*, 478 F.3d at 1124.

All three *Graham* factors favor minimal force: (1) the crimes at issue were misdemeanors, (2) Dr. Donahue was unarmed and did not make hostile motions toward the officers, and (3) although Dr. Donahue did not stand up when asked, he did not

---

[29] We explained why this additional showing was required in *Fisher*, 584 F.3d at 897: "Because handcuffing itself is not necessarily an excessive use of force in connection with an arrest, a plaintiff must show actual injury in order to prove that the officer used excessive force in the course of applying handcuffs."

actively resist. Even so, as confirmed by the video evidence, Officer Wihongi used the minimal, "small amount of force, like grabbing [a suspect]," that is "permissible in effecting an arrest." *Id.* at 1128.[30]

Further, the handcuffing was not an act of excessive force because a reasonable jury could not conclude Dr. Donahue suffered a non-de minimis "actual injury." *See Fisher*, 584 F.3d at 896-900 (determining a jury could conclude the suspect's affidavit and corroborating circumstances established a non-de minimis "actual injury" because the suspect's gunshot wounds were exacerbated by officers' handcuffing). Although Dr. Donahue alleges he sustained bruising, the record reveals no evidence of permanent injury. *See Vondrak*, 535 F.3d at 1209 (explaining plaintiff's permanent nerve injury from handcuffing established "actual injury"). Dr. Donahue's photographs show, at most, "superficial abrasions," *Koch*, 660 F.3d at 1248 (quotations omitted), and his affidavit alleging injury does not suffice under *Cortez*, 478 F.3d at 1129 (affidavit describing handcuff marks was "insufficient, as a matter of law, to support an excessive force claim").

\*     \*     \*     \*

Officer Wihongi appropriately used minimal force and Dr. Donahue did not suffer a non-de minimis actual injury. The district court therefore correctly determined that

---

[30] Dr. Donahue's declaration claims that Officer Wihongi "intentionally wrenched [his] shoulder and hyperflexed [his] wrist." App. at 163. The "videotape capturing the events in question" shows otherwise. *Scott*, 550 U.S. at 378.

Officer Wihongi did not use excessive force in violation of Dr. Donahue's Fourth Amendment rights when arresting him.

3. **Claim 3 – Excessive Detention**

Dr. Donahue argues he was unreasonably detained because any reasonable suspicion of intoxication dissipated either before or after probable cause for the arrest arose. We agree with the district court that there was no constitutional violation.

a. *Additional legal background*

"[R]easonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." *United States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir. 2013) (quotations omitted).[31] Further, "[a]n investigative [detention] can continue, even after the initial suspicion has dissipated, if the additional detention is supported by new reasonable suspicion of criminal activity. In other words, reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." *Id.* at 1198 (alterations and quotations omitted).

b. *Analysis*

We address Dr. Donahue's dissipation argument as applied to the time periods before and after probable cause arose.

---

[31] This court has explained that "as long as nothing in the first [investigative stop] serves to dispel [the officer's] fears or suspicions that criminal activity may be afoot," the officer "may perform a second investigative stop." *United States v. Padilla-Esparza*, 798 F.3d 993, 1000 (10th Cir. 2015) (alterations and quotations omitted).

i.  Pre-probable cause detention

Dr. Donahue asserts that even if reasonable suspicion of public intoxication initially existed, it dissipated before probable cause arose.  He avers that because Officer Wihongi lacked authority to demand his name, his refusal did not give rise to probable cause that he violated the failure-to-identify statute, and his detention should have ceased.[32]  We are not persuaded.

In her interview with Officer Wihongi, Ms. LaRose described Dr. Donahue as drunk and claimed he had insulted her.  *See* Wihongi 1 at 26:05-57.  Roughly 12 minutes after the interviews began, Dr. Donahue admitted to drinking.  *See* Wihongi 2 at 7:00-03.  Less than one minute later, Dr. Donahue again admitted to drinking.  *Id.* at 7:45-48.  As discussed above, these admissions, combined with Ms. LaRose's account, gave Officer Wihongi reasonable suspicion that Dr. Donahue was "under the influence" in violation of Utah's public intoxication statute.  Further, under the circumstances, Officer Wihongi appropriately weighed the credibility of two conflicting accounts and had reasonable suspicion that Dr. Donahue was under the influence to a degree of endangerment.  This reasonable suspicion, in turn, authorized Officer Wihongi to ask for Dr. Donahue's name.

Less than one minute after Dr. Donahue's second drinking admission, Officer Wihongi requested Dr. Donahue's name.  Dr. Donahue refused to provide it.  *See*

---

[32] *See* Aplt. Br. at 37 (arguing even if Officer Wihongi had reasonable suspicion Dr. Donahue was publicly intoxicated, "by [the time Dr. Donahue refused to give his name], [Officer] Wihongi's own interactions with [Dr.] Donahue had dissipated any suspicion of intoxication.").

Wihongi 2 at 8:26-33.[33]  As explained above, this refusal gave Officer Wihongi probable

cause that Dr. Donahue had violated the failure-to-identify statute.  The record shows no

events in the short interval between Dr. Donahue's admissions (which supplied

reasonable suspicion to demand his name) and his refusal to provide his name (which

provided probable cause to arrest) that could have dispelled the initial reasonable

suspicion.  *See United States v. Padilla-Esparza*, 798 F.3d 993, 1000 (10th Cir. 2015)

(determining nothing between first and second investigative stops dispelled officer's

reasonable suspicion of criminality).

### ii.  Post-probable cause detention

Dr. Donahue also appears to argue he was unduly detained because Officer

Wihongi's reasonable suspicion of public intoxication dissipated after the arrest when the

officers began to have questions about Ms. LaRose.  This argument is unpersuasive.

Even if reasonable suspicion for public intoxication dissipated after Dr. Donahue was

arrested, by that point he had failed to identify himself.  Dr. Donahue's violation of the

failure-to-identify statute supplied a fresh basis for his detention.  *See De La Cruz*, 703

F.3d at 1198 (noting that "additional detention [must] be supported by new reasonable

suspicion of criminal activity," and thus reasonable suspicion "need not be based on the

same facts throughout [the detention]" (alterations and quotations omitted)).

---

[33] Although Dr. Donahue offered to give his name as he was arrested, *see* Wihongi 2 at 8:40-46, Dr. Donahue did not provide his name and the officers already had probable cause that he had violated the failure-to-identify statute.  After Dr. Donahue was arrested, he again refused to give his name.  Wihongi 2 at 12:05-07.

If the officers' reasonable suspicion of public intoxication had dissipated before they demanded Dr. Donahue's name, their request for identification would not have been authorized under the stop-and-question statute. In that scenario, Dr. Donahue's failure to identify himself would not have provided probable cause for an arrest, and continued detention may have been unreasonable. But those are not the facts before us, where a fresh basis for detention arose. *See United States v. Lopez-Moreno*, 420 F.3d 420, 431 (5th Cir. 2005) (stating that "if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed").

\* \* \* \*

Dr. Donahue's dissipation argument fails. Officer Wihongi had reasonable suspicion to justify the pre-probable cause detention, and Dr. Donahue's failure to identify himself supplied a fresh basis for the post-probable cause detention. The district court therefore correctly determined that Officer Wihongi did not violate Dr. Donahue's Fourth Amendment rights in continuing to detain him.

### C. *Municipal Liability*

As noted above, after oral argument, we remanded this case to the district court to clarify the finality of (1) its memorandum decision and order, which granted Officer Wihongi's motion for summary judgment, *see Donahue*, 2018 WL 6699743, at \*1, and (2) its judgment, which stated that "the case is dismissed," App. at 18. On remand, the court issued an order stating that "the Court clarifies and supplements its original order and judgment to make clear that, because the Court rules as a matter of law that no

35

constitutional violation occurred, all claims against each and every named Defendant were and are hereby dismissed with prejudice." Dist. Ct. Doc. 58 at 1. Because we affirm summary judgment for Officer Wihongi on the ground that no constitutional violation was committed, judgment was proper for defendants SLCPD and SLC.

The SLCPD and SLC are "persons" subject to § 1983 liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (noting § 1983 applies to municipalities and other local government units). Under § 1983, a municipality is responsible only for its own illegal acts. It "may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009). Without an underlying constitutional violation by Officer Wihongi, SLCPD and SLC cannot be liable. The district court properly entered judgment dismissing the case.

## III.  **CONCLUSION**

Dr. Donahue failed to show a constitutional violation. The district court did not err in granting summary judgment for Officer Wihongi and entering judgment to dismiss the case. We affirm.