**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MATTHEW T. MGLEJ,

     Plaintiff - Appellee,

v.

RAYMOND GARDNER, a/k/a Officer
Raymond, an officer of the Garfield
County Sheriff's Office, in both his
individual and official capacities,

     Defendant - Appellant,

and

GARFIELD COUNTY SHERIFF'S
OFFICE, a subdivision of the State of
Utah, GARFIELD COUNTY, a political
subdivision of the State of Utah;
GARFIELD COUNTY JAIL, a subdivision
of the State of Utah,

     Defendants.

No. 19-4015

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:13-CV-00713-CW-DBP)**
_____

Frank D. Mylar (Andrew R. Hopkins, with him on the briefs) Mylar Law, P.C.,
Cottonwood Heights, Utah, for Defendant-Appellant Raymond Gardner.

Benjamin T. Welch (Stewart O. Peay, Snell & Wilmer, Salt Lake City, Utah, and
Amanda Z. Weaver, Snell & Wilmer, Phoenix, Arizona, with him on the brief) Snell &
Wilmer, Salt Lake City, Utah, for Plaintiff-Appellee Matthew T. Mglej.

_____

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

In this interlocutory appeal, Defendant Raymond Gardner, a Garfield County, Utah, sheriff's deputy, challenges the district court's decision to deny him qualified immunity from Plaintiff Matthew Mglej's 42 U.S.C. § 1983 claims stemming from Gardner's arresting Mglej in August 2011. Mglej alleged that Gardner violated the Fourth Amendment when he arrested Mglej without probable cause, used excessive force in doing so, and then initiated a malicious prosecution against Mglej. Having jurisdiction under 28 U.S.C. § 1291, see Mitchell v. Forsyth, 472 U.S. 511, 530 (1985), we AFFIRM the district court's decision to deny Gardner qualified immunity on all three claims.

## I. BACKGROUND

Because Deputy Gardner asserted qualified immunity in a summary judgment motion, we view the evidence in the light most favorable to Mglej. See Plumhoff v. Rickard, 572 U.S. 765, 768 (2014). The facts, then, for purposes of this appeal are as follows: In summer 2011, Mglej was on a cross-country trip when his motorcycle broke down in Boulder, an isolated town of approximately two hundred people located in Garfield County, Utah. Chuck Gurle, a mechanic in Boulder, let Mglej stay with him for a few days while Gurle waited for parts needed to repair the motorcycle.

Raymond Gardner was a Garfield County sheriff's deputy who lived in Boulder and patrolled there. The deputy first met Mglej on or about August 6 when he stopped Mglej for speeding on his motorcycle.[1]

A few days later, on August 8, 2011, while Mglej was still in Boulder awaiting the repair of his motorcycle, Deputy Gardner received a report from a local convenience store/gas station that $20 was missing from the store's register and they suspected someone matching Mglej's description took the money. Deputy Gardner, who was off duty that day, went to Gurle's home, knocked on the door, and asked to speak with Mglej outside, calling him by his first name, "Matthew or Matt." (Aplt. App. 538.) Mglej went outside and spoke with the deputy. When the deputy asked about the missing money, Mglej denied taking it. Gardner then asked Mglej for his "ID"—apparently a document that could serve as a form of identification. (Id. 540 ("Q. Did you ask him for his driver's license? A. I believe I asked him for an ID." (Gardner's deposition); see also id. 592 (Mglej's deposition).) Deputy Gardner explained to Mglej that, although Mglej denied taking the money, "I had still received a complaint of a criminal act and that as such I needed to do a report, which would require some information from him, to include some basic information usually contained on an ID, a driver's license, for example." (Id. 540.) Deputy Gardner told Mglej that he needed Mglej's full name, date of birth, driver's license information and address for his report (id. 540, 592), and that "it would be easier

---

[1] Deputy Gardner's account of his first meeting with Mglej differs, but for purposes of this appeal we accept Mglej's version of the facts. See Plumhoff, 572 U.S. at 768.

on all of us if he would just produce that information in the form of an ID or a driver's license" (id. 571 (Gardner's deposition); see also id. 592-93 ("Deputy Gardner told me I had to give him my ID." (Mglej's deposition).) When Mglej declined to give the deputy his ID before consulting with an attorney, Gardner arrested him.

Deputy Gardner then handcuffed Mglej behind his back and placed him in the front seat of the deputy's patrol car. Mglej complained that the handcuffs were too tight, but Gardner told him to stop saying that, because it did not matter.[2]

Before driving Mglej ninety-five miles to the Garfield County jail, Gardner stopped by his home to change into his uniform, leaving the handcuffed Mglej in the unlocked patrol car. When the deputy returned to the car, Mglej again complained that the handcuffs were too tight. Seeing that Mglej's hands were red, the deputy tried to loosen the handcuffs using the key but the handcuffs malfunctioned and the deputy could not loosen or remove them. Using tools from his garage, Deputy Gardner was eventually able to pry the handcuffs off Mglej's wrists after twenty minutes of work, causing Mglej significant pain and injury in the process.

Using a different set of handcuffs, the deputy again handcuffed Mglej and drove him to the Garfield County jail. On their way, Deputy Gardner received a call from an employee at the convenience store who reported that a more thorough examination of the store's register indicated that there was no money missing. The deputy, nevertheless, continued to the county jail, where he booked Mglej on two charges, "Obstructing

_____

[2] Deputy Gardner disputes Mglej's version of these events.

4

Justice" and "Failure to disclose identity." (Id. 416.) The deputy also completed a written "Statement of Probable Cause for a Warrantless Arrest." (Id. 415.) Based on the facts set forth in that statement, a judge approved Mglej's continued detention and set bail. Mglej was released on bail three days after he was arrested. He then had to hitchhike the ninety-five miles back to Boulder, where he found that his motorcycle had been vandalized and his possessions stolen. The charges against Mglej were later dropped.

Mglej then sued Deputy Gardner, among others. Relevant to this appeal, Mglej asserted claims under 42 U.S.C. § 1983 alleging that the deputy violated Mglej's Fourth Amendment protection against unreasonable seizures by 1) arresting him without probable cause, 2) using excessive force in doing so, and 3) initiating a malicious prosecution of Mglej.[3] Gardner moved for summary judgment on these claims, asserting qualified immunity. The district court denied that motion. It is that decision that the deputy challenges in this interlocutory appeal.

We have jurisdiction to consider Gardner's interlocutory appeal only to the extent it raises legal questions. See Plumhoff, 572 U.S. at 771-73; Mitchell, 472 U.S. at 530. We have no jurisdiction at this stage of the litigation to consider the district court's determination that Mglej presented sufficient evidence in support of his claims to survive

---

[3] Although Mglej asserted his malicious prosecution violated both the Fourth and Fourteenth Amendments, it is the Fourth Amendment that governs that claim. See Manuel v. City of Joliet, 137 S. Ct. 911, 914-20 (2017).

summary judgment.  See Plumhoff, 572 U.S. at 772-73 (applying Johnson v. Jones 515 U.S. 304 (1995)).

## II. DISCUSSION

With these jurisdictional limits in mind, we review de novo the district court's decision to deny Deputy Gardner summary judgment, viewing the evidence in the light most favorable to Mglej.  See Estate of Smart ex rel. Smart v. City of Wichita, 951 F.3d 1161, 1169 (10th Cir. 2020); see also Plumhoff, 572 U.S. at 768.  Once Gardner asserted qualified immunity, it was Mglej's burden to show "that (1) the officers' alleged conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation, such that every reasonable officer would have understood that such conduct constituted a violation of that right."  Estate of Smart, 951 F.3d at 1168 (internal quotation marks, alteration omitted); see also Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).

> To be clearly established, ordinarily "a preexisting Supreme Court or Tenth Circuit decision, or the weight of authority from other circuits, must make it apparent to a reasonable officer that the nature of his conduct is unlawful." Carabajal v. City of Cheyenne, 847 F.3d 1203, 1210 (10th Cir. 2017). In deciding whether a precedent provides fair notice, the Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). Instead, "the clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Although there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 138 S. Ct. at 1152 (quoting White, 137 S. Ct. at 551).

Corona v. Aguilar, 959 F.3d 1278, 1285-86 (10th Cir. 2020).

6

Mglej has met his two-part burden as to each of the three § 1983 claims at issue here to defeat qualified immunity.

## A. Claim 1: Arrest without probable cause

In his first claim, Mglej alleged that Deputy Gardner violated the Fourth Amendment because he arrested Mglej without probable cause.

### 1. Mglej has established a Fourth Amendment violation

> This Court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018) (internal quotation marks omitted); see also I.N.S. v. Delgado, 466 U.S. 210, 215 (1984). Mglej's first claim, and the parties' arguments and facts addressing it, implicate this entire spectrum of police-citizen encounters.

The parties do not dispute that Deputy Gardner arrested Mglej without a warrant outside the Gurle home after Mglej failed to give the deputy his driver's license or some other form of identification. "Under the Fourth Amendment, a warrantless arrest requires probable cause." Donahue v. Wihongi, 948 F.3d 1177, 1189 (10th Cir. 2020) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). Probable cause exists "if 'the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" Id. (quoting Adams v. Williams,

7

407 U.S. 143, 148 (1972)). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks omitted)). In claiming qualified immunity, Gardner asserted that there was probable cause to arrest Mglej under Utah law after he failed to produce his driver's license or some other form of identification.

Before turning to consider that contention, however, we clear away some confusion stemming from several of the parties' arguments. In the district court, Deputy Gardner asserted that there was also probable cause to arrest Mglej for theft. But the district court rejected that argument, and Gardner does not challenge that ruling on appeal. In any event, any probable cause to arrest Mglej for theft dissipated on the way to the jail during which time the convenience store employee called and told the deputy that there was no money missing.

At the jail, Deputy Gardner booked Mglej for both "Failing to disclose identity" and "Obstructing Justice." (Aplt. App. 416.) In this litigation, however, the deputy has not asserted there was probable cause to believe Mglej obstructed justice, and that offense clearly does not apply to the circumstances at issue here. The Utah obstruction of justice statute, Utah Code § 76-8-306(1)(i) (2011), provides that

> [a]n actor commits obstruction of justice if the actor, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal

8

offense . . . conceals information that is not privileged and that concerns the offense, <u>after a judge or magistrate has ordered the actor to provide the information</u>.

(Emphasis added.)  There was no such order in place at the time of Mglej's arrest.

Our focus here, then, is only on whether there was probable cause to arrest Mglej for "Failing to disclose identity."  (Aplt. App. 416.)  Mglej complains that Deputy Gardner did not originally arrest him for that charge, but instead just thought it up once he got Mglej to the County jail, after any evidence of a theft had dissipated.  That argument, however, is unavailing.  Because probable cause is measured by an objective standard, "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking."  <u>Wesby</u>, 138 S. Ct. at 584 n.2 (citing <u>Devenpeck</u>, 543 U.S. at 153-55 & 153 n.2).

We turn, then, to the question of whether there was probable cause to arrest Mglej under Utah law after he failed to produce his driver's license or some other form of identification.  Deputy Gardner points to a combination of three Utah statutes: one authorizing a police officer to conduct an investigative detention when he has reasonable suspicion a crime is being or has been committed, the second making it a misdemeanor for an investigative detainee to fail to give an officer his name under certain circumstances, and the third authorizing an officer to arrest a detainee for that misdemeanor offense.

The first of these three statutes, Utah Code § 77-7-15, is part of the Utah Code of Criminal Procedure and is entitled "Authority of Peace Officer to Stop and Question Suspect—Grounds."  In 2011, that statute provided that

[a] peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address, and an explanation of the individual's actions.

Utah Code § 77-7-15 (2011; subsequently amended.) This statute "codifies the requirements for an investigative detention" under Terry v. Ohio, 392 U.S. 1 (1968), Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000); see also Salt Lake City v. Bench, 177 P.3d 655, 659 (Utah Ct. App. 2008), limiting such investigative detentions to "public" places.[4] But "that statute provides no criminal sanctions for refusing to present identification when requested by an officer, and thus, cannot be used to support the arrest" at issue here.[5] Oliver, 209 F.3d at 1188 n.8.

The second statute, Utah Code § 76-8-301.5(1), is part of the Utah criminal code and it does impose criminal sanctions for certain conduct during an investigative detention. This is the statute Mglej was actually charged with violating. In 2011, § 76-8-301.5(1) made it a crime for a person to fail

to disclose identity if during the period of time that the person is lawfully subjected to a stop as described in Section 77-7-15:

(a) a peace officer demands that the person disclose the person's name;

(b) the demand described in Subsection (1)(a) is reasonably related to the circumstances justifying the stop;

---

[4] See infra note 10.

[5] Deputy Gardner's arguments that Mglej "violated" § 77-7-15, therefore, are unavailing because that statute addresses only the authority the State of Utah has given law enforcement officers, not what a detained individual must do to avoid criminal sanctions.

10

(c) the disclosure of the person's name by the person does not present a reasonable danger of self-incrimination in the commission of a crime; and

(d) the person fails to disclose the person's name.

(2011; subsequently amended.)[6] Violation of this statute is a class B misdemeanor, id. § 76-8-301.5(2) (2011), punishable by up to six months in jail and up to a $1,000 fine, id. §§ 76-3-204(2), 76-3-301(1)(d).

The third statute, Utah Code § 77-7-2(4), provides that "[a] peace officer may make an arrest under authority of a warrant or may, without warrant, arrest a person . . . when the peace officer has reasonable cause to believe the person has committed the offense of failure to disclose identity under Section 76-8-301.5." "Reasonable cause" as used in this statute is "synonymous with 'probable cause.'" State v. Harker, 240 P.3d 780, 784 n.19 (Utah 2010); see also Donahue, 948 F.3d. at 1190 n.18.[7]

---

[6] The Utah legislature enacted this version of § 76-8-301.5 in 2008. This statute is consistent with the United States Supreme Court's 2004 decision in Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 185 (2004). In Hiibel, the Supreme Court considered an arrest under a Nevada "stop and identify" statute that required a person detained during an investigative stop to "identify himself," which the Nevada Supreme Court interpreted to mean that the investigative detainee had to give his name, but not his driver's license or any other document. Id. at 181-82, 185. Balancing the intrusion of requiring a person, during an investigative detention, to give an officer his name against the government interests in investigating possible criminal activity, Hiibel held that "requiring a suspect to disclose his name in the course of a valid Terry stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures." Id. at 187-88.

[7] The applicability of this statute is directly tied to the scope of § 76-8-301.5, discussed previously.

With these three statutes in mind, "we examine the events leading up to the [§ 1983 plaintiff's] arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause," Wesby, 138 S. Ct. at 586 (internal quotation marks omitted), here to arrest Mglej under Utah Code § 76-8-301.5 for failing to disclose his identity. As we explain, the district court correctly concluded on the summary judgment record before it that there was not sufficient probable cause to arrest Mglej under that statute.

As a starting point, Gardner first contends that his encounter with Mglej was consensual and that, during such an encounter, he was entitled to ask Mglej for his driver's license or some other form of identification. In the district court, Deputy Gardner specifically asserted that "Mglej agreed to voluntar[il]y speak with Gardner," but then "refused to provide Deputy Gardner his name or address"; "[a]ccordingly Deputy Gardner felt he had no choice but to arrest Plaintiff" Mglej.[8] (Aplt. App. 168 (emphasis added).) But if this was simply a consensual conversation between Deputy Gardner and Mglej, as the deputy contends, then it would not have implicated Utah Code § 76-8-301.5, because that statute applies only to an officer's investigative detention of a suspect based on reasonable suspicion. See Oliver, 209 F.3d at 1185-86 (distinguishing

---

[8] Although in his pleadings Gardner's counsel contends that the deputy only asked Mglej for his name and address, the deposition testimony of both Deputy Gardner and Mglej is undisputed that the deputy instead asked Mglej for his driver's license or some other documentary form of identification.

between consensual encounters and investigative detentions, and noting § 77-7-15 addresses investigative detentions).

Deputy Gardner is correct that an officer's simply questioning an individual usually does not, alone, amount to a seizure for Fourth Amendment purposes. See Florida v. Bostick, 501 U.S. 429, 434 (1991). Furthermore, during a consensual encounter, an officer can ask to see a person's identification. See id. at 434-35. But the hallmark of a consensual encounter is that, notwithstanding the officer's questions and request for identification, "a reasonable person would feel free 'to disregard the police and go about his business.'" Id. at 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)); see also Oliver, 209 F.3d at 1185-86. Clearly a reasonable person in Mglej's position, however, would not have felt free to disregard Deputy Gardner's questions and go about his business because the deputy arrested Mglej for failing to produce his driver's license or some other form of identification. See Delgado, 466 U.S. at 216-17 (noting that, although an officer's questioning an individual is not sufficient to amount to a detention, "if the person[] refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure").

This, then, was not simply a consensual encounter between Mglej and Deputy Gardner or, if it started as a consensual encounter, it had evolved into an investigation detention. "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would

13

have believed that he was not free to leave.'" Id. at 215 (quoting United States v.

Mendenhall, 446 U.S. 544, 554 (1980)).

Gardner next contends that there was reasonable suspicion to believe that Mglej

stole $20 from the convenience store to justify the deputy's investigative detention of

Mglej.[9]  Assuming Deputy Gardner had reasonable suspicion, there still was no probable

cause to arrest Mglej under Utah Code § 76-8-301.5(1) when he refused to give Deputy

Gardner his driver's license or some other form of identification.  Section 76-8-301.5(1)

only makes it a crime for a detainee, during an investigative detention, to refuse to

provide his name to a police officer under certain circumstances.  Deputy Gardner did not

just ask Mglej for his name.  He instead asked Mglej for his driver's license or some

other form of identification, and the deputy arrested Mglej when he failed to provide an

ID.  There is a significant difference between asking an investigative detainee's name and

demanding instead his driver's license or some other form of identification document.

Asking for a driver's license or other identification is much more intrusive because, while

such a form of identification would have Mglej's name, it would include all sorts of

additional personal information that the officer was not authorized under Utah law to

demand during an investigative detention.  See Utah Code § 77-7-15 (authorizing officer

during investigative detention to ask detainee for his name, address and an explanation of

---

[9] The Supreme Court has recognized that, "absent some reasonable suspicion of
misconduct, the detention of" an individual simply to determine his identity violates
that individual's "Fourth Amendment right to be free from an unreasonable seizure."
Delgado, 466 U.S. at 216 (citing Brown v. Texas, 443 U.S. 47, 52 (1979)).

14

his actions).  More importantly here, the Utah Code limits the criminal offense set forth

in § 76-8-301.5 to refusing to provide one's "name."  This is consistent with the Supreme

Court's decision in Hiibel v. Sixth Judicial District Court, 542 U.S. 177 (2004), which

held that "requiring a suspect to disclose his name in the course of a valid Terry stop is

consistent with Fourth Amendment prohibitions against unreasonable searches and

seizures."  Id. at 187-88 (emphasis added).  Hiibel reached this conclusion after balancing

the intrusion of requiring a person, during an investigative detention, to give an officer

his name against the government interests in investigating possible criminal activity.  See

id.

Mglej's refusal to provide Deputy Gardner with his driver's license or some other

form of identification, then, as Deputy Gardner demanded, did not create probable cause

to arrest Mglej under Utah Code § 76-8-301.5(1).  Thus, sufficient to defeat summary

judgment, the record establishes that Deputy Gardner's decision to arrest Mglej violated

the Fourth Amendment.  See Donahue, 948 F.3d at 1189.[10]

**2. This Fourth Amendment violation was clearly established in August 2011**

---

[10] There are other problems with the probable cause Deputy Gardner claims he had to arrest Mglej under Utah Code § 76-8-301.5(1).  Section 76-8-301.5(1) only proscribes conduct during an investigative detention occurring in a "public place," as § 77-7-715 provides, and requires an officer's request for a detainee's name to be reasonably related to the circumstances justifying the "stop."  In denying Deputy Gardner summary judgment, the district court noted that there were genuine factual disputes underlying whether these other conditions were met here.  We have no jurisdiction to review those factual determinations in this interlocutory appeal.

15

Mglej has also sufficiently shown that this Fourth Amendment violation was clearly established at the time of Mglej's arrest, in August 2011.

> As a practical matter, "[i]n the context of a qualified immunity defense on an unlawful arrest claim, we ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012)). Put another way, a defendant is entitled to qualified immunity if she "could have reasonably believed that probable cause existed in light of well-established law." Felders ex rel. Smedley v. Malcom, 755 F.3d 870, 879 (10th Cir. 2014).

Corona, 959 F.3d at 1285.

Here, however, based on the plain language of the Utah statutes, Deputy Gardner could not have reasonably believed that he had probable cause to arrest Mglej for violating Utah Code § 76-8-301.5 when the deputy specifically demanded Mglej's driver's license or some other form of identification. The district court, therefore, correctly denied Deputy Gardner qualified immunity from Mglej's false arrest claim.

Mocek v. City of Albuquerque, 813 F.3d 912 (10th Cir. 2015), on which Deputy Gardner relies, is distinguishable. In that case, Mocek alleged that a police officer lacked probable cause to arrest him under a New Mexico statute that made it a crime to conceal one's "true name or identity" under certain circumstances. Id. at 922 (citing N.M. Stat. § 30-22-3). Because New Mexico courts had not addressed what the statute meant by "identity," the Tenth Circuit held that an objectively reasonable officer could have believed that he had probable cause to arrest Mocek under that statute when Mocek failed to produce his ID upon request, even though this Court doubted the state statute made it a crime not to produce an ID. Id. at 925-26. Different from the New Mexico statute at

16

issue in Mocek, it is clear that Utah Code § 76-8-301.5 only permits an officer to arrest a suspect for his failure to provide his "name" during such an investigative stop (provided the other conditions set forth in that statute are met). The Utah statute's language is unmistakably clear. The district court, therefore, correctly denied Deputy Gardner qualified immunity from Mglej's § 1983 unlawful-arrest claim.

**B. Claim two: Excessive force in handcuffing Mglej**

Next, Mglej alleged that Deputy Gardner violated the Fourth Amendment when he used excessive force to arrest Mglej by handcuffing him too tightly, and then ignoring Mglej's initial complaints that the handcuffs were too tight. See generally Graham v. Connor, 490 U.S. 386, 388 (1989) (stating that a claim alleging an officer used excessive force in making an arrest is governed by the Fourth Amendment). Mglej further contended that his injuries from the tight handcuffs were exacerbated when Deputy Gardner decided to use tools from the deputy's garage to pry the handcuffs off Mglej's wrists when they malfunctioned.

As an initial matter, the district court erred to the extent it linked this excessive force claim to Mglej's false-arrest claim, by holding that, "[b]ecause Officer Gardner lacked probable cause to believe a crime had occurred, any effort to constrain Mr. Mglej's liberty would have been excessive" (Aplt. App. 358). Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007) (reh'g en banc) ("reject[ing] the idea . . . that a plaintiff's right to recover on an excessive force claim is dependent on the outcome of an unlawful seizure claim"). Mglej's excessive-force claim is separate from his claim that Deputy Gardner unlawfully arrested him, and requires a separate inquiry. See id.; see

17

also Maresca v. Bernalillo Cty., 804 F.3d 1301, 1308, 1313, 1316 (10th Cir. 2015);

Romero v. Story, 672 F.3d 880, 890 (10th Cir. 2012).

> [A] plaintiff may argue law enforcement officers unlawfully arrested him. If the plaintiff successfully proves his case, "he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest." [Cortez, 478 F.3d at 1127] (emphasis added). If the plaintiff also alleges excessive force, the district court must conduct a separate and independent inquiry regardless of whether the plaintiff's unlawful arrest claim is successful. Id. And if the district court concludes the arrest was unlawful, the court may not automatically find any force used in effecting the unlawful arrest to be excessive. Instead, the district court must then analyze the excessive force inquiry under the assumption the arrest was lawful. As we said in Cortez:
>
>> [T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.
>
> Cortez, 478 F.3d at 1126 (emphasis added). If successful in proving his excessive force claim, the plaintiff "is entitled to damages resulting from that excessive force." Id. at 1127. Accordingly, "[t]he plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither." Id.

Romero, 672 F.3d at 890 (footnote omitted).

Here, then, only for purposes of Mglej's excessive force claim, we assume Deputy Gardner lawfully arrested Mglej, see id., and determine whether the force the deputy used to handcuff Mglej during that arrest was objectively reasonable, see Graham, 490 U.S at 397. Mglej asserts two theories as to why the force Deputy Gardner used in handcuffing Mglej was not objectively reasonable. He first asserts that the use of any

18

handcuffs at all during his arrest was excessive and, alternatively, that even if it was objectively reasonable to handcuff him, the force Deputy Gardner used to do that was excessive. Mglej's first theory does not survive qualified immunity, but his second theory does.

**1. It was not clearly established that handcuffing Mglej at all was objectively unreasonable**

Mglej first asserts that handcuffing him at all was objectively unreasonable under the circumstances presented here. But Mglej has failed to identify any relevant case law clearly establishing that Deputy Gardner violated the Fourth Amendment just by handcuffing Mglej. Cf. A.M. ex rel. F.M. v. Holmes, 830 F.3d 1123, 1152 (10th Cir. 2016) ("conclud[ing] that A.M.'s [excessive force] claim fails because there was no clearly established law indicating that F.M.'s minor status could negate Officer Acosta's customary right to place an arrestee in handcuffs during the arrest").

In fact, relevant case law generally suggests the contrary. The Supreme Court has held that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396; see also Cortez, 478 F.3d at 1128. See generally Atwater v. City of Lago Vista, 532 U.S. 318, 354-55 (2001) (holding arrest for minor offense, which included being handcuffed, placed in a patrol car and driven to the police station, though embarrassing and inconvenient, was not "made in an 'extraordinary manner, unusually harmful to [her] privacy or . . . physical interests.'" (quoting Whren v. United States, 517 U.S. 806, 818 (1996)).

19

Furthermore, the Tenth Circuit has noted that "in nearly every situation where an arrest is authorized . . . handcuffing is appropriate." Fisher v. City of Las Cruces, 584 F.3d 888, 896 (10th Cir. 2009); see also A.M., 830 F.3d at 1155 ("confidently conclud[ing] here that a reasonable officer in Officer Acosta's position would have understood Atwater's general acceptance of handcuffing incident to a lawful arrest to indicate that, in the ordinary course, handcuffing any arrestee—absent some injury specifically caused by the application of the cuffs—is lawful").[11]

### 2. However, Mglej has sufficiently alleged a claim that the force Deputy Gardner used to handcuff him was excessive

Mglej next asserts that, even if it was objectively reasonable to handcuff him, it was not objectively reasonable for Deputy Gardner to place the handcuffs on him so tightly and then to ignore Mglej's initial complaints about how tight the handcuffs were. "An excessive force claim that includes a challenge to the '[m]anner or course of handcuffing' requires the plaintiff to show both that 'the force used was more than reasonably necessary' and 'some non-de minimis actual injury.'" Donahue, 948 F.3d at 1196 (quoting Fisher, 584 F.3d at 897-98). This circuit has previously recognized that, "[i]n some circumstances, unduly tight handcuffing can constitute excessive force where

---

[11] The district court faulted Gardner because he always uses handcuffs when he transports an arrestee, instead of making a case-by-case determination as to whether handcuffs are needed in a particular situation. Deputy Gardner's subjective reasons for handcuffing Mglej, however, are not at issue here. "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see also Fisher, 584 F.3d at 894.

20

a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." Cortez, 478 F.3d at 1129; see also Vondrak v. City of Las Cruces, 535 F.3d 1198, 1208-09 (10th Cir. 2008). The salient factors we consider in making those determinations include how much force was objectively warranted in arresting Mglej, and any actual injury to Mglej, which aids us in determining whether Deputy Gardner used more force than objectively reasonable under these circumstances to handcuff Mglej.

### a. Mglej has sufficiently established that Deputy Gardner used more force than was objectively reasonable

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). In conducting this balancing, we consider the three non-exclusive factors the Supreme Court set forth in Graham:

> "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009) (quoting Graham, 490 U.S. at 396).

Donahue, 948 F.3d at 1196. Applying those factors here, we conclude only minimal force was objectively justified in arresting Mglej. See id. at 1196-97; Fisher, 584 F.3d at 894-96.

21

**i. Deputy Gardner arrested Mglej only for a minor misdemeanor**

"Under the first [Graham] factor, a 'minor offense supports the use of minimal

force.'" Donahue, 948 F.3d at 1196 (alteration incorporated) (quoting Perea v. Baca,

817 F.3d 1198, 1203 (10th Cir. 2016)). Deputy Gardner arrested Mglej for a non-violent

Class B misdemeanor—failing to provide the deputy with his name. See Utah Code

§ 76-8-301.5. That offense was punishable by no more than six months in jail and/or a

fine of no more than $1,000. Id. §§ 76-3-204(2), 76-3-301(1)(d). Furthermore, although

the parties do not address the question, it appears that the offense Deputy Gardner was

investigating when he confronted Mglej—the theft of twenty dollars—is also a non-

violent misdemeanor offense. See id. § 76-6-412(1)(d) (listing theft of less than $500 as

a Class B misdemeanor).[12]

These minor non-violent offenses clearly weigh against the objective need to use

much force against Mglej. See Donahue, 948 F.3d at 1189-90, 1197 (holding arrests

under Utah law for misdemeanor offenses of public intoxication and failure to identify

oneself warranted only minimal force); see also Koch v. City of Del City, 660 F.3d 1228,

1246-47 (10th Cir. 2011) (reaching the same conclusion when considering a

misdemeanor obstruction offense); Fisher, 584 F.3d at 895 (petty misdemeanor); Fogarty

---

[12] At the police station, Deputy Gardner also charged Mglej with obstruction of justice, even though that statutory offense clearly did not apply to the circumstances presented here. Even so, that offense would have been only a misdemeanor. See Utah Code § 76-8-306(3) (2011).

v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008) (petty misdemeanor disorderly conduct).

### ii. Mglej posed no threat to Deputy Gardner's safety or the safety of others

Under the second Graham factor, we consider whether Mglej posed "an immediate threat to the safety of the officers or others." Donahue, 948 F.3d at 1196 (quotation omitted). "Under the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others." Id. But there is no evidence that anything like that occurred here. Nor is there any evidence that otherwise suggested that Mglej posed any threat to Deputy Gardner's safety or the safety of others. In fact, Deputy Gardner felt comfortable leaving Mglej alone in the unlocked patrol car parked outside Gardner's home, where his wife and kids were, while Gardner ran inside to change into his uniform. He further felt comfortable bringing Mglej into his garage where the deputy then worked to pry off the malfunctioning handcuffs. The fact that there was no evidence that Mglej posed an immediate threat either to Deputy Gardner or others weighs against the use of more than minimal force against Mglej. See Donahue, 948 F.3d at 1197 (holding evidence that arrestee was unarmed and made no hostile motions toward officers supported use of only minimal force); Koch, 660 F.3d at 1246-47 (holding fact that arresting officer did not argue that the arrestee posed any safety threat weighed in favor of § 1983 plaintiff alleging use of excessive force).

23

### iii. There is no evidence that Mglej was resisting or trying to evade arrest

Under the third <u>Graham</u> factor, we consider whether Mglej was actively resisting arrest or attempting to evade arrest by flight. <u>See</u> <u>Donahue</u>, 948 F.3d at 1196. There was no evidence at all to suggest that Mglej was trying to resist arrest or flee. <u>See id.</u>; <u>see also</u> <u>Fisher</u>, 584 F.3d at 896. In fact, Deputy Gardner testified at his deposition that he felt comfortable leaving the handcuffed Mglej in the unlocked patrol car parked in front of the deputy's home, where his wife and kids were, because Mglej "didn't exhibit any behavior that would lead me to believe that he would try to escape." (Aplt. App. 553.) All three <u>Graham</u> factors, then, indicate that only minimal force was objectively reasonable in arresting Mglej. <u>See</u> <u>Donahue</u>, 948 F.3d at 1196; <u>Fisher</u>, 584 F.3d at 896.

### b. Mglej has sufficiently established that the handcuffs caused him an actual injury

The next question is whether Deputy Gardner used more than the minimal force against Mglej that was objectively reasonable. Where, as here, the alleged excessive force is the use of handcuffs that were too tight, Mglej has to show that the handcuffs caused him "some actual injury that is not de minimis, be it physical or emotional." <u>Cortez</u>, 478 F.3d at 1129; <u>see also</u> <u>Donahue</u>, 948 F.3d at 1196-97; <u>Fisher</u>, 584 F.3d at 898-99. "Because handcuffing itself is not necessarily an excessive use of force in connection with an arrest, a plaintiff must show actual injury in order to prove that the officer used excessive force in the course of applying handcuffs." <u>Donahue</u>, 948 F.3d at 1197 n.29 (quoting <u>Fisher</u>, 584 F.3d at 897).

24

Mglej has made a sufficient showing of an actual non-de minimis injury here, based on the medical evidence that he suffered long-term nerve damage to his left hand. See Vondrak, 535 F.3d at 1209 (explaining that plaintiff's permanent nerve injury from handcuffing established the required "actual injury").

In addition to this long-lasting nerve injury, Mglej also asserted that he suffered prolonged and significant pain during the handcuffing. It is, of course, a fact that handcuffs are not comfortable and arrestees frequently complain about pain caused by their use. See United States v. Rodella, 804 F.3d 1317, 1328 (10th Cir. 2015) ("Handcuffing inevitably involves some use of force, and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied." (citation, internal quotation marks omitted)). In light of that, conclusory complaints of pain alone are not ordinarily sufficient to support a Fourth Amendment excessive force claim. See Koch, 660 F.3d at 1247-48 (holding plaintiff's evidence, that she suffered superficial abrasions but did not establish any neurological injury, was insufficient to establish the required actual injury needed to support an excessive force claim based on being handcuffed too tightly).

But in making that determination, we focus on the specific facts presented in a given case. See generally A.M., 830 F.3d at 1151 (noting that "the Supreme Court has said that 'for the most part per se rules are inappropriate in the Fourth Amendment context'" (quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). Here, we have the unusual case where there is more than just an uncorroborated sworn statement from Mglej that the handcuffs hurt his wrists. See Fisher, 584 F.3d at 900 (holding § 1983

25

plaintiff had established an actual injury, noting that "[t]his case does not involve only a self-serving affidavit asserting pain alone, without corroborating facts"). Deputy Gardner's own actions corroborated that the handcuffs were too tight. After initially ignoring Mglej's complaints that the handcuffs were too tight, once the deputy checked the handcuffs and saw that Mglej's hands were red, the deputy testified in his deposition that he realized that it was "necessary to remove the handcuffs." (Aplt. App. 553.) This was especially the case, according to the deputy, because it was going to take two hours to drive Mglej to the jail. When the deputy was unable to loosen the handcuffs with the key, Deputy Gardner was sufficiently concerned about how tight the handcuffs were that he deemed it necessary to use his own tools to pry the malfunctioning handcuffs off Mglej. The deputy's initial attempts to remove the malfunctioning handcuffs made them even tighter, causing Mglej further injury and greater pain.

It took Deputy Gardner twenty minutes to pry off the handcuffs, and this was after the initial fifteen to thirty minutes that Deputy Gardner ignored Mglej's complaints that the handcuffs were too tight. "It is possible for someone to be handcuffed for so long that handcuffing constitutes an unreasonable use of force." J.H. ex rel. J.P. v. Bernalillo Cty., 806 F.3d 1255, 1258 n.2 (10th Cir. 2015) (citing Fisher, 584 F.3d at 894). Furthermore, the twenty minutes it took the deputy to destroy the handcuffs in order to pry them off intensified the pain, injury and fear Mglej suffered. Then, once the deputy got the malfunctioning handcuffs off, he put a new set of handcuffs on Mglej, which continued to cause Mglej's injured wrists pain, put the handcuffed Mglej back into the patrol car and drove two hours to the jail. See Fisher, 584 F.3d at 894 (holding that, even when initial

26

handcuffing is objectively reasonable, other factors, such as prolonged duration, can affect the objective reasonableness calculation).

Viewing the evidence in the light most favorable to Mglej, then, the lasting physical injury he suffered and the extreme prolonged pain inflicted on him is sufficient for Mglej to meet his burden of establishing an actual, non-de minimis injury to support an excessive force claim based on being handcuffed too tightly. See Cortez, 478 F.3d at 1129 ("In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."); see also Vondrak, 535 F.3d at 1208-09.

Furthermore, as the cases cited above indicate, such a Fourth Amendment violation was clearly established in August 2011. See Vondrak, 535 F.3d at 1209 (stating that, "at the time of Vondrak's arrest [in 2003], the right to be free from unduly tight handcuffing was 'clearly established'—as were the contours of the right," citing Cortez, 478 F.3d at 1129). In particular, this court previously recognized, in 2008, that a claim that overly tight handcuffs caused permanent nerve damage was sufficient to establish a Fourth Amendment excessive force claim. See id. The district court, therefore, did not err in denying Deputy Gardner qualified immunity on this excessive force claim.[13]

---

[13] The clearly established Fourth Amendment violation that Mglej has alleged is that Deputy Gardner applied the handcuffs too tightly and ignored Mglej's initial complaints that they were too tight. Mglej has not alleged a separate excessive force claim stemming particularly from the deputy's attempts to remove the malfunctioning handcuffs.

27

## C. Count 3: Malicious prosecution

Mglej finally alleged that Deputy Gardner initiated a malicious prosecution against him by booking him into jail on charges of failing to identify himself and obstructing justice. Based on those charges and the written probable cause statement Deputy Gardner completed in support of those charges, a judge approved Mglej's continued detention and set bail. The charges against Mglej were eventually dropped.

> To state a § 1983 claim for malicious prosecution, a plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."

Montoya v. Vigil, 898 F.3d 1056, 1066 (10th Cir. 2018) (quoting Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008)).

In moving for qualified immunity, Deputy Gardner asserted that Mglej could not establish the third and fourth elements of his malicious prosecution claim, the lack of probable cause and that Deputy Gardner acted with malice. As discussed earlier, however, Deputy Gardner lacked even arguable probable cause to charge Mglej with failing to give his name under Utah Code § 76-8-301.5. Moreover, even Deputy Gardner does not contend that there was even arguable probable cause to charge Mglej with obstructing justice.

As for malice, it "may be inferred if a defendant causes the prosecution without arguable probable cause." Stonecipher, 759 F.3d at 1146. The plain language of the two statutes under which Deputy Gardner booked Mglej clearly do not apply to the

28

circumstances presented in this case. Moreover, charging Mglej with obstructing justice, which clearly did not apply, supported doubling the bail Deputy Gardner suggested, from $555 to $1,110. The judge set Mglej's bail at $1,000.

Furthermore, Mglej testified in his deposition that, when the intake officer at the jail asked Deputy Gardner on what charges the deputy was booking Mglej, Deputy Gardner responded: "I don't know. Let me look at the book. I am sure I can find something." (Aplt. App. 600.) Mglej contends that the deputy then looked through the Utah criminal code before charging Mglej under two criminal statutes that, by their plain language, did not apply to the circumstances precipitating Mglej's arrest. Mglej has, thus, sufficiently met the malice element of a malicious prosecution claim.[14]

In the district court, Deputy Gardner did not specifically challenge that this constitutional violation—malicious prosecution—was clearly established in August 2011. In any event, it was. In 2008, the Tenth Circuit stated that "it of course has long been clearly established that knowingly arresting a defendant without probable cause, leading

---

[14] While ordinarily a Fourth Amendment claim is measured by an objective reasonableness standard, the malice element of a Fourth Amendment malicious prosecution claim focuses on the defendant officer's knowledge or state of mind. See Young v. City of Idabel, 721 F. App'x 789, 804 (10th Cir. 2018) (unpublished) (summarizing Tenth Circuit cases holding "malice" element of § 1983 malicious prosecution claim is met when there is evidence that the defendant officer knowingly made false statements or knew there was no probable cause to support prosecution); see also Stonecipher, 759 F.3d at 1146 (citing Wilkins, 528 F.3d at 800-01, for the proposition that malice may be inferred from a § 1983 defendant's intentional or reckless conduct). See generally Manuel, 137 S. Ct. at 925 (Alito, J., dissenting) (noting tension between "subjective bad faith, i.e., malice [which] is the core element of a malicious prosecution claim" and Fourth Amendment's objective reasonableness standard).

to the defendant's subsequent confinement and prosecution, violates the Fourth Amendment's proscription against unreasonable searches and seizures." <u>Wilkins</u>, 528 F.3d at 805.

## III. CONCLUSION

Viewing the evidence, as we must, in the light most favorable to Mglej, the district court correctly denied Deputy Gardner qualified immunity on Mglej's three § 1983 claims for false arrest, excessive force, and malicious prosecution. We, therefore, AFFIRM the district court's decision to deny Gardner summary judgment on these three claims.